Shayna Fernandez Watts (027342)
FERNANDEZ WATTS LAW PLLC
5040 E. Shea Blvd. Ste. 272
Scottsdale, Arizona 85254
Phone: (602) 760-5100
Fax: (602) 760-5130
Email:Shayna@FernandezWattsLaw.com
*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alexis Lindvall, | Case No.: CV-24-00768-PHX-DWL |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | **Jury Trial Demanded** |
| The Law Office of Daniel Hutto, PLLC; Daniel Hutto; Shannon McShay; and John Carbone, | |
| Defendants. | |

  This action seeks judgment and remedies for Plaintiff Alexis Lindvall for unlawful pregnancy discrimination, sex discrimination, disability discrimination, and retaliation for exercising protected rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e as amended by the Pregnancy Discrimination Act of 1978, the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, the Pregnant Workers Fairness Act (PWFA), Arizona's Fair Wages and Healthy Families Act, and Arizona law. This complaint alleges nine discrete claims against Plaintiff's former employer and its employees and agents, which are listed in the Relief Requested section, infra.

  This First Amended Complaint and Demand for Jury Trial is filed pursuant to Federal Rules of Civil Procedure ("FRCP") Rules 15(a)(1) and 38, and LRCiv 15.1(b).

1

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the federal claims [Counts One through Six] asserted in this Complaint under 28 U.S.C. § 1331, and over the state law claims [Counts Seven through Nine] pursuant to 28 U.S.C. § 1367(a).

2. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

## PARTIES

3. Plaintiff is an individual who resided in the State of Arizona at all relevant times.

4. Defendant The Law Office of Daniel Hutto (the "Firm") is an Arizona limited liability company and law firm with its principal place of business in Maricopa County, Arizona.

   A. At all times material to this Complaint, the Firm had at least fifteen employees.

   B. At all times material to this Complaint, this Firm was an "employer" in as that term is defined and used in A.R.S. § 23-350(3), A.R.S. § 23-371(G), and 42 U.S.C. § 2000e-(b).

   C. At all times material to this Complaint, the Firm was both a "covered entity" and an "employer" as those terms are defined and used in 42 U.S.C. § 2000gg(2)(B)(7)(i) and 42 U.S.C. § 12111(2) and (5)(A).

5. Defendant Daniel Hutto ("Hutto") is an individual who resides in the State of Arizona who was, at all times material to this Complaint, acting on behalf of the Firm, both a tortfeasor and as Lindvall's employer as that term is defined and used in A.R.S. § 23-371(G).

6. Defendant Shannon McShay ("McShay") is an individual who resides in the State of Arizona who was, at all times material to this Complaint, acting on behalf of the Firm, both as tortfeasor and as Lindvall's employer as that term is defined and used in A.R.S. § 23-371(G).

7. Defendant John Carbone ("Carbone") is an individual who resides in the State of Arizona who was, at all times material to this Complaint, acting on behalf of the Firm, both as a tortfeasor and as Lindvall's employer as that term is defined and used in A.R.S. § 23-371(G).

## FACTS SUPPORTING CLAIMS

8. Plaintiff Lindvall graduated from the Arizona State University College of Law in 2018 and passed the bar exam and was admitted to the practice of law in the State of Arizona.

9. Plaintiff had been practicing law for 3 years without incident or any adverse employment action when the firm hired Plaintiff as an Associate Attorney on or about October 26, 2021.

10. Plaintiff was well qualified for the job.

11. Plaintiff was never criticized or disciplined for poor performance while working for Defendants. To the contrary, Plaintiff received multiple outstanding performance reviews in which Defendants praised her client management, drafting skills and court performance. McShay consistently referred to Plaintiff's drafting skills as "prolific" to Plaintiff and in front of Firm employees.

12. In or around August 2022, Plaintiff revealed her pregnancy to the firm's co-owner, McShay, and the managing attorney, Carbone.

13. Plaintiff was subjected to a hostile work environment thereafter by the Defendants, including but not limited to being told many times that her pregnancy was a "problem" for the firm.

14. Defendants did not have a maternity or paternity or child bonding leave policy and they told Plaintiff that she could take unpaid leave for her pregnancy.

15. Plaintiff repeatedly asked about a transition plan for her cases while she was gone and each time she was brushed off by the firm and told her cases would be "on ice".

16. Eventually, Plaintiff was tasked with assigning her cases to other attorneys in the firm (in addition to her normal caseload) in the office to handle during Plaintiff's anticipated pregnancy leave.

17. Plaintiff then provided information and updates on all her cases to the assigned attorneys from that point until her leave and Plaintiff included the managing partner, Defendant Carbone, on all of these communications.

18. In early 2023, Plaintiff met with Carbone and requested the firm file Notices of Substitution of Counsel Within the Firm on all of Plaintiff's cases while Plaintiff would be out on pregnancy/maternity leave.

19. Without Notices of Substitution, Plaintiff's bar number and reputation would be at stake on her assigned cases even though she would be on unpaid leave and unable to work on the cases which had been assigned to her by the Firm.

20. Carbone denied Lindvall's request outright and immediately and gave no reason or explanation.

21. Throughout Plaintiff's pregnancy, McShay complained to Plaintiff, telling her that her impending maternity leave made McShay's job harder.

22. Plaintiff apologized to McShay on multiple occasions to try to make amends, but her work environment continued to be hostile in response to her upcoming pregnancy leave.

23. In early March 2023, Hutto communicated to Plaintiff that her pay would be docked upon return from maternity leave for the benefits she would receive while on leave (e.g., health insurance).

24. Plaintiff continued working until March 30, 2023 without taking any leave.

25. On Friday, March 31, 2023, Plaintiff was feeling sick and requested taking that day off as a paid sick leave day which she earned and was lawfully entitled to have pursuant to the Arizona Fair Wages and Healthy Families Act, A.R.S. § 23-371 et seq. ("AFWHFA").

26. Plaintiff went into labor the next day, Saturday, April 1, 2023, and her baby was born on Sunday, April 2, 2023.

27. Plaintiff began a period of unpaid maternity leave beginning on approximately April 3, 2023 and continuing until July 4, 2023.

28. Prior to her return, Plaintiff met with Hutto, McShay, and Carbone about her requests for certain accommodations upon returning from maternity leave, including the ability to work remotely from home one day each week for a short period. Plaintiff explained to them that her billable hours expectations would still be met, and this would be both a practical and reasonable short-term accommodation. Defendants denied Plaintiff the ability to work from home one day each week without engaging in an interactive process to try to find another reasonable accommodation for her post birth needs.

29. Defendants allowed at least one other lawyer, a non-pregnant male attorney, to work remotely away from the law office for extended periods for approximately 50% of the time so that he could spend time with his daughter in another state.

30. This attorney is frequently away from the office, and Defendants have not held him to have resigned.

31. On July 5, 2023, Plaintiff returned to the law office and immediately experienced renewed hostility, discrimination, and retaliation from each of the three individual Defendants, which she complained about to them.

32. Plaintiff requested accommodations upon her return, one of which was to be able to pump/lactate in her office and take calls or meetings while doing so.

33. Plaintiff then noticed a picture of a cartoon cow floating around the office.

34. When Plaintiff asked about the picture, Plaintiff was told that Hutto printed it out for the Plaintiff to put it on her office door as a sort of "Do Not Disturb" sign while breast pumping to embarrass her.

35. Plaintiff learned Hutto discussed Plaintiff's pregnancy with several other employees at the firm and criticized and derided her for becoming pregnant prior to her return.

5

36. Plaintiff understood that she was expected to tape the cartoon cow picture to her office door each time she pumped, 3 times a day, each time feeling embarrassed and ashamed.

37. Plaintiff also experienced hostility from some other firm employees whenever she needed to pump.

38. McShay was unwilling to talk with her on the phone while she was pumping in her office and instead demanded they discuss cases face to face, after Plaintiff was done pumping.

39. When Plaintiff returned from leave, Defendant abruptly handed back all her cases on her first day back, without the same transition period allotted to the attorneys who took them over.

40. In this respect again, Plaintiff was being treated differently to her peers who were given transition information and time to get to know the cases and adjust schedules accordingly without repercussions or ridicule.

41. One of those cases was set for a temporary orders hearing to relocate a client's children to California in 7 days, with pretrial statements and exhibits due to the court in 2 days.

42. In reviewing the file, Plaintiff realized that no exhibits or work had been done to prepare for this hearing while she had been out on leave, so she immediately followed up with the assigned attorney and paralegal regarding the status of the case with an e-mail.

43. Carbone "replied" all to Plaintiff's email:
"If you have issues with the way your colleagues handled your cases in your absence please schedule a time for us to speak in private. Since you will be doing this hearing you should select the exhibits you intend to introduce; please work with your client to obtain the documents you intend to use."

44. Plaintiff replied, "I cannot do a hearing that I do not have adequate time to prepare for." Plaintiff had concerns about why the firm had seemingly neglected the client and expected her to be fully caught up on the case, draft a Pretrial Statement, and submit exhibits in two days.

45. Carbone responded:

"A week is enough time to prepare for an hour-long temporary orders hearing. This is not a conversation we will have via email. Please find time on your calendar to meet with Shannon and I if you feel you cannot fulfill your job duties."

46. Carbone included two other female attorneys of childbearing age at the Firm on his email as if he wanted to "send a message" to them specifically.

47. Later that day, Carbone and McShay determined the assigned attorney would cover the hearing instead and then also decided to take the case away from Plaintiff entirely (an adverse employment action), despite Plaintiff's insistence that she wanted to keep the case.

48. The assigned attorney was a non-pregnant employee with less legal experience.

49. Not only did this result in lost billable work for the Plaintiff, but it caused the assigned attorney to resent Plaintiff for having to take back the case at the last minute and this attorney then began being hostile towards Plaintiff.

50. The law office's employees were empowered by firm leadership to act out against Plaintiff after firm leadership made it known within the firm that Plaintiff's pregnancy and requested postpartum accommodations were a problem and inconvenient.

51. Defendants hired outside counsel, Andrew S. Lishko at May Potenza Baran & Gillespie, to investigate Plaintiff's internal complaints of sex discrimination, and pregnancy discrimination.

52. Even though Plaintiff was interviewed by outside counsel Andrew S. Lishko, there was no further investigation, remedial steps, or report or resolution regarding her complaints.

53. The alleged "investigation" was nothing more than a meeting with Plaintiff and Mr. Lishko, during which Carbone, and McShay joined the meeting unexpectedly and Plaintiff was forced to address them directly with her complaints some of which directly

involved them, making it difficult for Plaintiff to speak candidly about their conduct in that closed and confined meeting.

54. During that meeting, Plaintiff attempted to continue to discuss her complaints and concerns, but Carbone responded by mischaracterizing events, and when Plaintiff attempted to correct him, he snapped back at her stating words to the effect of: "You will listen to me while I speak! I am your superior!"

55. The investigation did not follow the firm's own policies; the Defendants made no attempt to keep the investigation confidential or to prevent retaliation.

56. Instead, Plaintiff was met with additional acts of retaliation and hostility including unreasonable work assignments and unfair treatment.

57. By August 30, 2023, Plaintiff decided she needed to report the additional retaliation and hostility of firm employees again and did so to Hutto.

58. Hutto assured Plaintiff that there would be a "solution", but no plan was created and no investigation was conducted and there was no "solution".

59. On October 11, 2023, Plaintiff had a doctor's appointment related to her post-pregnancy health at 10:15 a.m.

60. Plaintiff met with McShay on her way out to inform McShay of the reason for the appointment—suspected postpartum depression and insomnia—and to request assistance.

61. McShay communicated that she was supportive of Plaintiff seeking help, encouraged Plaintiff to go to the appointment, and assured Plaintiff she was willing to assist as needed.

62. McShay commented that she loved drafting and would be happy to review Plaintiff's work to help out.

63. At Plaintiff's doctor's appointment, her doctor diagnosed her as suffering from severe postpartum depression and insomnia and urged her to be hospitalized immediately for treatment and stabilization for a short period of time.

8

64. Plaintiff returned to the office and communicated the diagnosis and recommendation to McShay including her imminent hospitalization.

65. Plaintiff explained to McShay that her doctor told her he feared she was a harm to herself and to her 6-month-old baby and that Plaintiff had these same concerns about herself.

66. Post-partum depression is a disability as defined by the ADAAA. See, e.g., *Hostettler v. College of Wooster*, 895 F. 3d 844, 853-854 (6th Cir., 2018); *Stevens v. Concentrix Corporation*, 2019 WL 6728362 (E.D. Mich., 2019). Insomnia is a disability as defined by the ADAAA. See, e.g., *Felix v. New York City Transit Authority,* 324 F. 3d 102, 104-105 (2nd Cir., 2003).

67. Plaintiff's requested accommodation at that moment was for time off for hospitalization and recovery from her two disabilities.

68. McShay communicated this information from Plaintiff to Carbone who called Plaintiff's husband the same day confirming that he was aware of Plaintiff's medical condition as well.

69. Plaintiff was hospitalized overnight from Wednesday, October 11 – Thursday, October 12, 2023.

70. On October 11, 2023 at 1:43p.m., Carbone signed and filed a document in a family court case wherein Plaintiff was the attorney of record stating:

> "On October 11, 2023, counsel for Mother experienced a personal medical emergency which will require counsel to be out of the office for an indeterminate period and will preclude her from attending the Trial currently set for October 16, 2023."

71. Notably, the pleading does not state Ms. Lindvall resigned and would not be returning and acknowledged that the firm knew Ms. Lindvall sought medical leave for a "medical emergency".

72. Plaintiff texted a firm colleague on October 13, 2023 for advice on how to communicate with firm management regarding the situation, and that colleague suggested

9

Plaintiff reach out on Monday, stating "Nobody here is expecting to hear from you before then anyway."

73. Plaintiff then reached out to her doctor for documentation regarding her condition so that she could provide it to Defendants on Monday when she would be requesting accommodations for her medical care prior to returning to work full-time at the office.

74. Defendants did not reach out to contact Plaintiff or her husband to ask if she had been discharged from the hospital or whether she was okay.

75. On **Saturday**, October 14, 2023, the Defendants sent a letter to Plaintiff via email stating that the Defendants terminated Plaintiff (an adverse employment action), effective October 11, 2023 (the day Plaintiff was admitted into the hospital for postpartum depression).

76. In the letter, authored by Andrew Lishko as counsel for the Defendants, Defendants admitted that:

(A) Plaintiff confided in McShay that she was "struggling with sleeplessness and other issues for the past several weeks," and later that she told McShay that a doctor had advised Plaintiff "to immediately go to the hospital because [she] had been advised by the mental health professional that [she was] a danger to [her]self and [her] child."; and

(B) McShay had encouraged Plaintiff to go seek medical help.

77. The Defendants' letter stated that Plaintiff was prohibited from returning to the law office for any reason and that her remote access to email and the firm's system had been disabled.

78. Defendants further alleged falsely that that (A) Plaintiff had resigned from the firm, and (B) was unable to practice law.

79. In fact, Plaintiff did not resign, nor did she state she was unable to practice law.

10

80. Plaintiff responded to the letter from the firm on Sunday, October 15, 2023, by email, requesting a return-to-work date and for the firm to engage in the interactive process regarding the same.

81. In a responding letter dated Tuesday, October 17, 2023, Defendants doubled down on the separation, again claiming Plaintiff had resigned based on her communications with McShay wherein she disclosed her postpartum depression and insomnia and requested accommodations.

82. The Defendants' October 17 letter was threatening in nature and a transparent attempt to discourage Plaintiff from exercising her legal rights in response to the mistreatment, discrimination and wrongful termination by the Defendants.

83. After Defendants terminated Plaintiff, Defendants also refused to pay Plaintiff her accrued and earned bonus which was approximately $3,300.00 when she was fired unexpectedly.

84. The firm had an established policy of paying lawyers, including Plaintiff, a "bonus" each quarter, which was a contractual promise to pay to the lawyers in the firm a bonus wage in addition to their regular salaries, which bonus was determined by a formula based upon the lawyers' billable hours, in order to encourage lawyers to be productive.

85. While the bonus payments were paid out quarterly, there was no policy or notice given that a lawyer had to continue to be employed when the bonuses were paid in order to receive a bonus payment for the hours they had worked in the preceding quarter.

86. Plaintiff reasonably relied upon the promised bonus that she had earned and accrued up until the time she was fired and worked long hours to provide the firm with billable hours. Defendants terminating Plaintiff without paying her the earned bonus up until the date of firing was (A) a breach of the implied covenant of good faith and fair dealing, and also (B) unjustly enriched the firm.

87. Defendants claim Plaintiff is not entitled to her earned bonus since she was unemployed at the time it was paid, but Defendants do not have a written policy in their handbook or otherwise providing notice of stating this "requirement."

88. Defendants have thus inexcusably failed to pay Plaintiff her earned bonus which is a "wage" as defined by A.R.S. § 23-350(7), and prohibited by A.R.S. § 23-351(C), and therefore the Plaintiff is entitled to treble damages as provided by A.R.S. § 23-355(A).

89. Plaintiff requested and required reasonable accommodations from the firm related to her pregnancy/ childbirth, including but not limited to her request to work from home one day a week upon her return; general flexibility regarding attendance hours so long as her billable hours' requirement was met; privacy while pumping while also being able to work by phone and on her computer during pumping sessions; assistance with cases and drafting; and leave, including maternity leave and subsequent leave to address her postpartum depression.

90. Defendants' actions caused Plaintiff to experience severe emotional distress, worry about the clients she was serving and the impact her firing might have on their interests in their respective cases, and an unexpected loss of income and financial hardship. Her insomnia and anxiety was exacerbated following her unexpected and unlawful termination.  She experienced ongoing insomnia, increased depression and anxiety, loss of appetite and nausea, headaches, humiliation, excessive crying, loss of self-worth and self-doubt, exhaustion, edginess, and intense anger.

91. Plaintiff withdrew from her friends and spent weeks worrying about her ability to provide for her family.

92. Plaintiff engaged in protected activity when she complained internally to the Defendants of discrimination and harassment, need for a disability accommodation(s), and took protected paid leave as a pregnancy accommodation.

93. There is a causal link between the protected activities and the adverse employment actions supported by the timing of the protected activity in relation to the adverse employment action, the fact that Defendants have no documented performance deficiencies, and the false, malicious and pretextual allegations by the Defendants that she had resigned and that she was unable to continue practicing law.

94. The unlawful employment discrimination and retaliation alleged herein were intentional violations of federal statutes done maliciously or with reckless disregard of Plaintiff's federal statutory rights as an employee by a law firm that was well aware of its duties and obligations under the federal statutes listed in the prayer for relief, infra.

95. When Defendants terminated Plaintiff, Defendants were aware Plaintiff had been told by her doctor that at that point in time she posed a danger to herself and her child and that she was seeking emergency medical care.

96. In the letter terminating Plaintiff, Defendants (through counsel, Andrew Lishko) wrote: "You informed Shannon that you were advised to immediately go to the hospital because you had been advised by the mental health professional that you were a danger to yourself and your child."

97. Defendants intentionally rushed to terminate Plaintiff on a weekend knowing Plaintiff would update them and request additional accommodations upon her return on Monday and knowing that terminating Plaintiff under the circumstances (i.e., in an emailed letter from their attorney immediately upon her discharge from a psychiatric hospital for suicidal ideations) would be extremely distressing.

98. When Defendants terminated Plaintiff they also immediately terminated Plaintiff's communications with clients and prohibited her from ever returning to the Law Firm for any reason, elevating the termination to one that suggested Plaintiff had committed a wrongful act.

99. Other attorneys who have resigned are given time to pack up their belongings and close out their affairs, but Defendants told Plaintiff she was no longer welcome and prohibited from communications and from coming to the Firm ever again.

100. Defendants also had the Firm process server, whom Plaintiff had routinely dealt with in a professional capacity, deliver Plaintiff's personal belongings to her home on Monday morning without warning. The process server called Plaintiff when he was already outside her residence which caused Plaintiff to suffer further embarrassment and trauma.

101. Defendants acted with an evil intent to cause severe emotional distress to Plaintiff.

102. Defendants conduct caused Plaintiff to suffer severe emotional distress including mental anguish and emotional and physical distress of mind and body in the form of fear, shock, anger, worry, humiliation, nervousness, irritability, insomnia, loss of appetite, increased depression and anxiety, nausea, headaches, humiliation, excessive crying, loss of self-worth and self-doubt, exhaustion, edginess, and intense anger.

103. Defendants purposefully and willfully terminated Plaintiff's employment following her use of what should have been protected paid sick time pursuant to A.R.S. § 23-371 et seq. ("FWHFA").

104. Plaintiff suffered an adverse employment action when Defendants terminated her.

105. There is a causal link between Plaintiff's attempted use of sick time and the adverse employment action.

106. And if an employer takes an adverse action against an employee within 90 days of that employee taking sick leave, it "raise[s] a presumption that such action was retaliation, which may be rebutted by clear and convincing evidence that such action was taken for other permissible reasons." A.R.S. § 23-364(B).

107. Plaintiff took sick leave after returning from her pregnancy and most recently on October 11, 2023, and Defendants fired her that same day.

108. The very close temporal proximity between Plaintiff taking sick leave and her termination triggers the above-mentioned rebuttable presumption, and Defendants are presumptively liable to Plaintiff for unlawful termination under the FWHFA.

109. Plaintiff filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on November 6, 2023, charge #540-2024-00342.

110. Plaintiff received her Notice of Right to Sue on this charge on March 28, 2024 upon request.

111. Plaintiff exhausted her administrative remedies with the EEOC and her Complaint was filed within ninety days of her receipt of her Notice of Right to Sue.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests the Court grant the Plaintiff orders and judgment awarding her the following relief against the Defendants specified.

**Count One: Title VII Sex Discrimination in Employment: Disparate Treatment and Hostile Environment, 42 U.S.C. § 2000e-2(A)**
**(against The Law Office of Daniel Hutto, PLLC only)**

1. Compensatory damages;

2. Punitive damages;

3. Injunctive relief including, inter alia, back pay and lost benefits;

4. Reasonable attorney's fees and expert fees, pursuant to Federal Rules of Civil Procedure Rule 54(d)(2), and 42 U.S.C. § 2000e-5(k); and

5. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

**Count Two: Title VII Retaliation for reporting Sex Discrimination in Employment, 42 U.S.C. § 2000e-3(A)**
**(against The Law Office of Daniel Hutto, PLLC only)**

1. Compensatory damages;

2. Punitive damages;

3. Injunctive relief including, inter alia, back pay and lost benefits;

4. Reasonable attorney's fees and expert fees, pursuant to Federal Rules of Civil Procedure Rule 54(d)(2), and 42 U.S.C. § 2000e-5(k); and

5. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

**Count Three: Violation of Pregnant Worker Fairness Act, 42 U.S.C. § 2000gg et seq.**
**(against The Law Office of Daniel Hutto, PLLC only)**

1. Compensatory damages;

2. Punitive damages;

3. Injunctive relief including, inter alia, back pay and lost benefits;

4. Reasonable attorney's fees and expert fees, pursuant to Federal Rules of Civil Procedure Rule 54(d)(2), and 42 U.S.C. §2000e-5(k); and

5. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

**Count Four: Retaliation in Violation of Pregnant Worker Fairness Act, 42 U.S.C. § 2000gg-2(f)**
**(against The Law Office of Daniel Hutto, PLLC only)**

1. Compensatory damages;

2. Punitive damages;

3. Injunctive relief including, inter alia, back pay and lost benefits;

4. Reasonable attorney's fees and expert fees, pursuant to Federal Rules of Civil Procedure Rule 54(d)(2), and 42 U.S.C. § 2000e-5(k); and

5. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

**Count Five: ADA Discrimination in Employment: Disparate Treatment and Failure to Accommodate, 42 U.S.C. § 12112**
**(against The Law Office of Daniel Hutto, PLLC only)**

1. Compensatory damages;

2. Punitive damages;

3. Injunctive relief including, inter alia, back pay and lost benefits;

4. Reasonable attorney's fees and expert fees, pursuant to Federal Rules of Civil Procedure Rule 54(d)(2), and 42 U.S.C. § 2000e-5(k);

5. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

**Count Six: ADA Retaliation for reporting disability and need for reasonable accommodation – termination of employment, 42 U.S.C. § 12203
(against The Law Office of Daniel Hutto, PLLC only)**

1. Injunctive relief including, inter alia, back pay and lost benefits;

2. Reasonable attorney's fees and expert fees, pursuant to Federal Rules of Civil Procedure Rule 54(d)(2), and 42 U.S.C. § 2000e-5(k); and

3. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

**Count Seven: Failure to pay wages (earned bonus), A.R.S. § 23-351(C) and A.R.S. § 23-355(A),** *or in the alternative***, Breach of the Implied Covenant of Good Faith and Fair Dealing,** *or in the alternative***, Unjust Enrichment
(against The Law Office of Daniel Hutto, PLLC only)**

1. The sum Plaintiff had accrued or earned as a bonus based upon her billable hours when she was fired of $3,300, to be trebled pursuant to A.R.S. § 23-355(A), totalling $9,900;

2. Reasonable attorney's fees pursuant to A.R.S. § 12-341.01; and

3. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

**Count Eight: Retaliation - Termination for Exercise of Right to Take
Paid Sick Leave, A.R.S. § 23-371 et seq ("FWHFA) and A.R.S. § 23-364(B)
(against all Defendants)**

1. The following relief provided by A.R.S. § 23-364(G):

…the balance of the wages or earned paid sick time owed, including interest thereon, and an additional amount equal to twice the underpaid wages or earned paid sick time. Any employer (the Defendants) who retaliates against an employee or other person in violation of this article shall be required to pay the employee an amount set by the commission or a court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued or until legal judgment is final. The commission and the courts shall have the authority to order payment of such unpaid wages, unpaid earned sick time, other

amounts, and civil penalties and to order any other appropriate legal or equitable relief for violations of this article. . .;

2. Reasonable attorney's fees pursuant to A.R.S. § 23-364(G); and

3. Costs of the action pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and A.R.S. § 23-364(G).

### Count Nine: Intentional Infliction of Severe Mental Distress
### (against all Defendants)

1. General and compensatory damages in an amount to be determined by the trier-of-fact;

2. Punitive damages in an amount to be determined by the trier-of-fact; and

3. Taxable costs pursuant to Federal Rules of Civil Procedure, Rule 54(d)(1), and 28 U.S.C. § 1920.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues and claims so triable pursuant to the Seventh Amendment to the U.S. Constitution, FRCP Rule 38, 42 USC § 1981a(c), and 42 U.S.C. § 2000e-5(k).

DATED this 14th day of May 2024.

FERNANDEZ WATTS LAW PLLC

/s/*Shayna Fernandez Watts*
5040 E. Shea Blvd. Ste. 272
Scottsdale, Arizona 85254
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants:

MAY POTENZA BARAN & GILLESPIE
Andrew S. Lishko
Central Arts Plaza
1850 N. Central Ave., 16th Floor
Phoenix, AZ 85004-4633
602.252.1900
alishko@maypotenza.com

/s/ *Tiffany Fernandez*