**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alexis Lindvall,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Law Office of Daniel Hutto PLLC, et al.,<br><br>　　　　　Defendants. | No. CV-24-00768-PHX-DWL<br><br>**ORDER** |

　　　Alexis Lindvall ("Plaintiff") previously worked as an associate attorney at The Law Office of Daniel Hutto, where she was supervised by Shannon McShay, John Carbone, and Daniel Hutto (collectively, "Defendants"). (Doc. 11.) In this action, Plaintiff has asserted claims for pregnancy- and disability-based discrimination and retaliation and has also asserted a claim for intentional infliction of emotional distress ("IIED"). Now pending before the Court is Defendants' Rule 12(b)(6) motion to dismiss the IIED claim. (Doc. 11.) For the reasons below, the motion is granted but Plaintiff is granted leave to amend.

**BACKGROUND**

I.　Factual Allegations

　　　The following allegations, presumed true, are derived from Plaintiff's operative pleading, the First Amended Complaint ("FAC"). (Doc. 10.)

　　　Plaintiff is an attorney. (*Id.* ¶ 8.) The Law Office of Daniel Hutto is a law firm. (*Id.* ¶ 4.) Daniel Hutto, Shannon McShay, and John Carbone were "at all times material to this Complaint, acting on behalf of the Firm, both as tortfeasor and as [Plaintiff's] employer

as that term is defined and used in A.R.S. § 23-371(G)."  (*Id.* ¶¶ 5-7.)

In or around August 2022, after almost a year working for Defendants, Plaintiff revealed that she was pregnant.  (*Id.* ¶¶ 9, 12.)  Following this disclosure, Plaintiff "was subjected to a hostile work environment thereafter by the Defendants, including but not limited to being told many times that her pregnancy was a 'problem' for the firm."  (*Id.* ¶ 13.)  Plaintiff was then "tasked with assigning her cases to other attorneys in the firm (in addition to her normal caseload) in the office to handle during Plaintiff's anticipated pregnancy leave."  (*Id.* ¶ 16.)  During this time, McShay "complained to Plaintiff, telling her that her impending maternity leave made [McShay's] job harder."  (*Id.* ¶ 21.)

On April 3, 2023, Plaintiff began her period of unpaid maternity leave.  (*Id.* ¶ 27.)  During maternity leave, Plaintiff "met with Hutto, McShay, and Carbone about her requests for certain accommodations upon returning from maternity leave, including the ability to work remotely from home one day each week for a short period.  Plaintiff explained to them that her billable hours expectations would still be met, and this would be both a practical and reasonable short-term accommodation.  Defendants denied Plaintiff the ability to work from home one day each week without engaging in an interactive process to try to find another reasonable accommodation for her post birth needs."  (*Id.* ¶ 28.)

"On July 5, 2023, Plaintiff returned to the law office and immediately experienced renewed hostility, discrimination, and retaliation from each of the three individual Defendants, which she complained about to them."  (*Id.* ¶ 31.)  For example, Plaintiff "requested accommodations . . . one of which was to be able to pump/lactate in her office and take calls or meetings while doing so."  (*Id.* ¶ 32).  Following this request, Hutto printed out a picture of a cartoon cow for Plaintiff to put on her office door and use as a "Do Not Disturb" sign while she was breast pumping.  (*Id.* ¶¶ 33-34, 36.)  Furthermore, Defendants "abruptly handed back all her cases on her first day back, without the same transition period allotted to the attorneys who took them over" (*id.* ¶ 39), and when Plaintiff expressed doubt about her ability to be caught up in time, Carbone took the case from her and gave it to another attorney, which resulted "in lost billable work for the Plaintiff . . . [and] caused the

assigned attorney to resent Plaintiff for having to take back the case at the last minute . . . ." (*Id.* ¶¶ 42-49.)

"Defendants hired outside counsel . . . to investigate Plaintiff's internal complaints of sex discrimination, and pregnancy discrimination." (*Id.* ¶ 51.) During a meeting with outside counsel, Plaintiff and Defendants disagreed over how to characterize certain events, and when Plaintiff "attempted to correct" Defendants, Carbone "snapped back at her stating words to the effect of: 'You will listen to me while I speak! I am your superior!'" (*Id.* ¶¶ 53-54.) After this investigation, Plaintiff "was met with additional acts of retaliation and hostility including unreasonable work assignments and unfair treatment," which Plaintiff reported to no avail. (*Id.* ¶¶ 56-58.)[1]

On October 11, 2023, Plaintiff had a doctor's appointment related to "suspected postpartum depression and insomnia," and she communicated this suspected diagnosis to McShay. (*Id.* ¶¶ 59-60.) McShay "communicated that she was supportive of Plaintiff seeking help, encouraged Plaintiff to go to the appointment, and assured Plaintiff she was willing to assist as needed." (*Id.* ¶ 61.)

During the doctor's appointment on October 11, 2023, Plaintiff was diagnosed with "severe postpartum depression and insomnia" and told that she required immediate hospitalization. (*Id.* ¶ 63.) Plaintiff returned to work that same day to inform McShay of the diagnosis, of her fear that "she was a harm to herself and to her 6-month-old baby," and of her impending hospitalization. (*Id.* ¶¶ 64-65.) "Plaintiff's requested accommodation at that moment was for time off for hospitalization and recovery from her [depression and insomnia]." (*Id.* ¶ 67.)

Plaintiff was hospitalized for one night from Wednesday, October 11, 2023, to Thursday, October 12, 2023. (*Id.* ¶ 69.) During this time, "Defendants did not reach out to contact Plaintiff or her husband to ask if she had been discharged from the hospital or whether she was okay." (*Id.* ¶ 74.)

---

[1] Here and elsewhere throughout the FAC, Plaintiff uses conclusory terms like "hostility," "acts of retaliation," and "threatening" (Doc. 10 ¶¶ 81-82) without providing any facts to support those conclusions.

On Saturday, October 14, 2023, "the Defendants sent a letter to Plaintiff via email stating that the Defendants terminated Plaintiff . . . effective October 11, 2023." (*Id.* ¶ 75.) The letter also stated that Plaintiff was prohibited from "returning to the law office for any reason and [informed her] that her remote access to email and the firm's system had been disabled." (*Id.* ¶ 77.) "Defendants further alleged falsely that . . . (A) Plaintiff had resigned from the firm, and (B) was unable to practice law." (*Id.* ¶ 78.)

On October 15, 2023, Plaintiff responded to Defendants' letter, "requesting a return-to-work date and for the firm to engage in the interactive process regarding the same." (*Id.* ¶ 80.)

On October 17, 2023, Defendants sent a response letter that "doubled down on the separation" and that was "threatening in nature and a transparent attempt to discourage Plaintiff from exercising her legal rights in response to the mistreatment, discrimination and wrongful termination by the Defendants." (*Id.* ¶¶ 81-82.) After terminating Plaintiff, Defendants also "refused to pay Plaintiff her accrued and earned bonus which was approximately $3,300.00 . . . ." (*Id.* ¶¶ 83-88.)

Plaintiff alleges that Defendants knew that their decision to terminate her over the weekend "in an emailed letter from their attorney immediately upon her discharge from a psychiatric hospital for suicidal ideations" would be extremely distressing. (*Id.* ¶ 97.) Plaintiff further alleges that Defendants' decision to "immediately terminate[] [her] communications with clients and prohibit[] her from ever returning to the Law Firm . . . suggested Plaintiff had committed a wrongful act." (*Id.* ¶ 98.)

Plaintiff alleges these actions "caused [her] to experience severe emotional distress, worry about the clients she was serving and the impact her firing might have on their interests in their respective cases, and an unexpected loss of income and financial hardship. She experienced ongoing insomnia, increased depression and anxiety, loss of appetite and nausea, headaches, humiliation, excessive crying, loss of self-worth and self-doubt, exhaustion, edginess, and intense anger." (*Id.* ¶ 90.) Plaintiff also alleges she "withdrew from her friends and spent weeks worrying about her ability to provide for her family."

1  (*Id.* ¶ 91.)

2  II.   Procedural History

3  On April 5, 2024, Plaintiff commenced this action. (Doc. 1.)

4  On May 14, 2024, Plaintiff filed the FAC. (Doc. 10.)

5  On May 29, 2024, Defendants filed the pending motion to dismiss. (Doc. 11.) The motion is now fully briefed (Docs. 13, 14) and neither side requested oral argument.

**DISCUSSION**

I.   Legal Standard

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court may also dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.   Analysis

Under Arizona law, an IIED claim has three elements: (1) "the conduct by the defendant must be 'extreme' and 'outrageous'"; (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005) (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)). Defendants do not dispute

the second element—they only dispute whether a reasonable jury could find that they engaged in "extreme or outrageous conduct" and whether Plaintiff suffered "severe emotional distress." (Doc. 11 at 6, 9.)[2]

### A. **Extreme Or Outrageous Conduct**

"A trial court is to act as a gatekeeper to determine whether the alleged actions are 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Morgan v. Freightliner of Arizona, LLC*, 2017 WL 2423491, *8 (D. Ariz. 2017) (quoting *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995)). "[T]he Court need not determine whether Defendants' conduct was outrageous enough to create liability, only whether reasonable persons could differ as to whether the conduct is 'extreme and outrageous.'" *Id*. "[C]onduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct." *Reel Precision, Inc. v. FedEx Ground Package Sys., Inc.*, 2016 WL 4194533, *2 (D. Ariz. 2016) (quoting *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980)). "It 'must completely violate human dignity. The conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Id.* (quoting *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987)). Additionally, Arizona courts have noted that "[i]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Mintz*, 905 P.2d at 563 (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988)).

Defendants argue that "[a]s alleged, [Plaintiff's] claims do not rise to the level of outrageousness required by Arizona law." (Doc. 11 at 7.) Defendants also cite an array of cases in which courts dismissed purportedly similar IIED claims. (*Id.* at 7-9.) Defendants

---

[2] Defendants also contend that "[e]ven if the Court finds that the FAC sufficiently states an IIED claim against the Law Office, it should nevertheless dismiss the IIED claim as to the Individual Defendants." (Doc. 11 at 12-13.) It is unnecessary to reach this alternative dismissal argument here in light of the conclusions reached below.

argue that their termination-related actions, "far from being outrageous . . . are reasonable for a law firm to take when a departing employee leaves the law firm." (*Id.* at 9.)[3]

Plaintiff responds by providing the following characterization of her factual allegations:

> Defendants subjected [Plaintiff] to months of ridicule and embarrassment, during and after her pregnancy, failed to adequately address her complaints or follow their policies regarding the complaints, and then, after learning [Plaintiff] was suffering from insomnia and postpartum depression, crafted a false narrative to terminate [Plaintiff], concluding without any medical or professional basis that [Plaintiff] was unable to practice law entirely, imparting the devastating news and assessments on her career knowing she had been deemed a danger to herself and her child, knowing this would strip her of her employer-based medical insurance, knowing their narrative was false, and knowing their actions would harm her. Moreover, they intentionally conspired to deliver the news on the weekend to preempt [Plaintiff's] return, uncharacteristically prohibiting [Plaintiff] from ever returning to the firm for any reason and then denying her earned pay. Even after [Plaintiff] expressed her written objections to the same, Defendants continued to fabricate her resignation and inability to practice law because she sought emergency medical treatment for postpartum depression, insomnia, and was a danger to herself and baby. They used their positions of authority to intimidate Plaintiff when she made complaints and through their actions after the termination.

(Doc. 13 at 7.) According to Plaintiff, such allegations "surpass the standard required for an intentional infliction of emotional distress claim in Arizona." (*Id.*) Plaintiff also argues that courts must consider the following two factors when evaluating the sufficiency of an IIED claim: (1) the position of power occupied by the defendant; and (2) the defendant's knowledge that the plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental condition. (*Id.* at 7-8.) Regarding the first factor, Plaintiff states that Defendants "were in a position of authority" over her and that "Defendants used their

---

[3] Defendants contend that Plaintiff's decision to label Count Nine as a claim for "Intentional Infliction of Severe Mental Distress" is a basis for dismissal because "Arizona law does not appear to recognize an independent tort for 'severe mental distress.'" (Doc. 11 at 4.) This argument lacks merit. *Sessions v. Chrysler Corp.*, 517 F.2d 759, 760-61 (9th Cir. 1975) ("The fact that appellant mislabeled his cause of action . . . is irrelevant, so long as he was entitled to relief . . . on any theory.") (cleaned up).

- 7 -

power to intimidate [her] when she made complaints, subject her to ridicule and embarrassment, and then fire her." (*Id.* at 8.) Plaintiff provides as examples Carbone yelling, "You will listen to me while I speak! I am your superior!" and Hutto "circulat[ing] and mock[ing] [Plaintiff] by printing out a picture of a cartoon cow for [her] to use as her do not disturb sign while pumping knowing as her supervisor, it would be harder to refuse." (*Id.*)[4] This power dynamic, according to Plaintiff, "makes the conduct more outrageous." (*Id.*) Regarding the second factor, Plaintiff argues that Defendants' conduct was especially outrageous because after she disclosed her medical condition, "the very next thing [Defendants] did, before checking on her or her status, was to send a one-way communication notifying her she was terminated and unable to practice law with a manipulative narrative, jeopardizing her sense of stability further." (*Id.* at 9.) Plaintiff argues that Defendants' knowledge of her susceptibility "makes the conduct all the more outrageous," because "[i]t is difficult to imagine conduct more 'atrocious and utterly intolerable in a civilized community' than to intentionally risk harm to a sick person and her baby." (*Id.*) Plaintiff also argues that Defendants' cited cases are "distinguishable and inapplicable" and offers other cases she believes should guide the analysis. (*Id.* at 10-13.)

In reply, Defendants argue that "the position between the employer/employee is—at best—de minimis in analyzing the outrageousness of alleged conduct" because in employment cases, "the employer is necessarily in a greater position of power" but "[n]evertheless, Arizona courts have repeatedly emphasized that conduct sufficient to meet the outrageousness requirement of an IIED claim" in the employment context is "'extremely rare.'" (Doc. 14 at 5.) Defendants address the second factor by arguing that "a clear line of distinction is temporally drawn in the FAC," which "is critical to the analysis." (*Id.* at 5.) Defendants state that the majority of the FAC's allegations of outrageous conduct, including the cow sign, the "snapp[ing]" at Plaintiff, and the

---

[4]      Plaintiff also argues that McShay "used her position of authority and faux support to get [Plaintiff] to confide in [McShay] regarding her conditions, despite the fact [McShay] intended to terminate [Plaintiff's] employment that day explicitly because of these conditions." (Doc. 13 at 8.)

- 8 -

description of her pregnancy as a problem, occurred before October 11, 2023, the date when Plaintiff claims to have informed Defendants of her insomnia and post-partum depression. (*Id.* at 6.) Defendants contend that these allegations, without more, constitute at most mere "insensitivity and cruel disregard," which does not "satisfy Arizona's clearly articulated policy that extreme and outrageous conduct is 'extremely rare' in the employment context." (*Id.*) Defendants argue that the remaining conduct alleged in the FAC, which occurred after Plaintiff disclosed her condition and mostly involved the process of termination, is "insufficient to meet the standard of outrageousness." (*Id.* at 7.)

The Court agrees with Defendants that the FAC fails to allege the sort of "extreme and outrageous" conduct necessary to support an IIED claim under Arizona law. Defendants do not dispute that the FAC states valid claims for discrimination and harassment. (Doc. 11 at 1.) The underlying factual allegations also establish a distressing degree of insensitivity toward Plaintiff. Nevertheless, once the timeline of events is clarified, the challenged conduct does not qualify as the sort of "extremely rare," "atrocious and utterly intolerable" conduct, *Mintz,* 905 P.2d at 563, that "completely violate[s] human dignity . . . [and] strike[s] to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Pankratz*, 744 P.2d at 1189.

The core of Plaintiff's argument revolves around her peculiar susceptibility to emotional distress—that Defendants' knowledge that she "was suicidal and suffering from post-partum depression . . . makes the conduct all the more outrageous." (Doc. 13 at 9.) Indeed, Plaintiff relies on this susceptibility to attempt to distinguish nearly all of Defendants' cited cases. (*Id.* at 10-12.) But because Plaintiff alleges that Defendants only became aware of her condition on October 11, 2023, it is necessary to distinguish between the conduct that occurred before and after that date.

The most alarming actions by Defendants occurred during this pre-knowledge period, including Defendants telling Plaintiff that her pregnancy was "a problem for the firm" (Doc. 10 ¶ 13), complaining that her pregnancy was making their jobs harder (*id.* ¶ 21), giving Plaintiff a cartoon cow to serve as her "Do Not Disturb" sign to use when she

was pumping (*id.* ¶¶ 33-36), and "snapp[ing]" at Plaintiff, "[y]ou will listen to me while I speak! I am your superior!" (*Id.* ¶ 54). These actions may demonstrate "insensitivity and cruel disregard," but they do not rise to the level of extreme and outrageous, especially not in the employment context, where IIED claims are subjected to higher standards. *Mintz*, 905 P.2d at 563. This is so even though, as in all employment contexts, Defendants held positions of power over Plaintiff. Courts have not hesitated to reject employment-related IIED claims under similar circumstances. *See, e.g., Mintz*, 905 P.2d at 563-64 (employer failed to promote the plaintiff, forced her to return to work, and informed her, via a letter delivered to her hospital bed where she was being treated for severe emotional problems, that her job duties had been reassigned); *Nelson v. Phoenix Resort Corp.*, 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994) (employer used an armed security team to escort the plaintiff out of the premises in middle of night, allowed the plaintiff to use the bathroom on the way out only if accompanied into the stall by armed escorts, and fired the plaintiff in the lobby in front of coworkers and the media); *Reel Precision,* 2016 WL 4194533 at *3 (employer forced employees to perform a public "walk of shame" after failing to correctly perform their job responsibilities); *Pontikis v. Lucid USA Inc.*, 2023 WL 6127693, *3 (D. Ariz. 2023) (employer "publicly reprimanded" the plaintiff, wrongfully withheld a promotion from the plaintiff, prohibited co-workers from speaking with the plaintiff, "ostraciz[ed]" the plaintiff "from work-related conversations," and expressed an intent to terminate the plaintiff in the presence of co-workers).

The cases on which Plaintiff relies—*Thorp v. Home Health Agency-Arizona, Inc.*, 941 F. Supp. 2d 1138 (D. Ariz. 2013), *Forsman v. Chicago Title Ins. Co.*, 2006 WL 4682253 (D. Ariz. 2006), and *Coffin v. Safeway, Inc.*, 323 F. Supp. 2d 997 (D. Ariz. 2004)—are factually distinguishable and do not compel a different outcome. Each of those cases involved relentless sexual abuse and/or harassment and the failure of supervisors to address that misconduct. *Thorp*, 941 F. Supp. 2d at 1142 ("During a work function at a local resort, [Plaintiff's supervisor] engaged in a conversation in front of Plaintiff about sexually 'fisting' the waitress, and asked Plaintiff, 'I wonder what it would be like if god

was fisting the office manager? What do you think?'"); *Forsman*, 2006 WL 4682253 at \*1, \*3 ("Plaintiff Forsman alleges that . . . on at least three separate occasions, she was physically and verbally sexually harassed by . . . a significant client [of her employer] . . . ; that she reported the events to her supervisor but the supervisor did not take action; that a co-worker . . . retaliated against Forsman after learning of the reports; that Forsman asked her supervisor to speak with Hickman about the retaliation; and that Forsman was discharged that day. . . . [T]his case involves allegations of physical abuse or assault, factors not present in *Mintz*."); *Coffin*, 323 F. Supp. 2d at 1003-04 ("Plaintiff alleges that [her supervisor's] unwanted sexual overtures and actions occurred 'repeatedly' and 'continuously' between July 2001 and February 2002. As noted, Plaintiff alleges that [her supervisor] made verbal remarks to her such as 'I bet you taste good,' and 'I wish you would gain more weight because I like more meat on your butt,' would caress Plaintiff's hands 'in a sexual manner,' and would walk up behind her and in close proximity tell Plaintiff he wanted to rub up against her body.").

The worst pre-knowledge conduct that Plaintiff alleges here—that her pregnancy was called "a problem," that she was "snapped" at, and that she was made to use a cow sign as a "Do Not Disturb" sign—does not approach the same level of severity. Plaintiff has not identified a single case—nor has the Court found any—where a court determined that comparable conduct could reasonably be described as rising to the level of "extreme or outrageous." In fact, the most analogous cases reach the opposite conclusion. *Hutchinson v. Am. Fam. Mut. Ins. Co.*, 2013 WL 1340051, \*12 (D. Ariz. 2013) ("Plaintiff alleges that after she became pregnant, [the defendant] addressed her rudely, became angry when she missed work due to physician appointments, refused to speak with her for two days when she was late due to a physician appointment, slammed things angrily onto her desk, exclaimed to her that he had a life too, when she asked him what was wrong and once she overheard him on the phone stating that one of his girls is pregnant and he would have to get rid of her. Plaintiff alleges that as a result of this treatment, she suffered severe emotional distress. Assuming Plaintiff's version of events as true, the Court does not find

[the defendant's] behavior was extreme and outrageous.").

This leaves the conduct that occurred after Defendants obtained knowledge of Plaintiff's peculiar susceptibility. That conduct cannot support an IIED claim because it was routine employment conduct that, even if taken with knowledge of Plaintiff's condition, cannot reasonably be viewed as rising to the level of "extreme or outrageous." Plaintiff alleges that on October 11, 2023, she told Defendants about her diagnosis of "severe post-partum depression" and her "imminent hospitalization." (Doc. 10 ¶ 64.) Plaintiff further alleges that she was informed of her termination three days later, on October 14, 2023, via letter. (*Id.* ¶ 75.) Plaintiff takes issue with various ways in which this termination decision was communicated to her, including that Defendants "did not reach out to contact Plaintiff or her husband to ask if she had been discharged from the hospital or whether she was okay" (*id.* ¶ 74); that the letter stated that Plaintiff "was prohibited from returning to the law office for any reason and that her remote access to email and the firm's system had been disabled" and also falsely accused her of resigning and being unable to practice law (*id.* ¶¶ 77-79); that Defendants sent another letter on October 17, 2023 that reiterated their reasons and that "was threatening in nature and a transparent attempt to discourage Plaintiff from exercising her legal rights" (*id.* ¶¶ 81-82); and that Defendants "refused to pay Plaintiff her accrued and earned bonus which was approximately $3,300 . . . ." (*id.* ¶ 83).

Because Defendants were aware of Plaintiff's peculiar susceptibility to emotional distress at the time of the events in question, the level of outrageousness the conduct must reach is lower. *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 716 P.2d 1013, 1016 (Ariz. 1986) ("[F]actors that have been traditionally considered by a jury or court [in evaluating outrageousness] include . . . defendant's knowledge that the plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental condition . . . ."). But even with this lower bar, Plaintiff has failed to state a claim. The challenged conduct here involves routine employment actions—informing an employee of termination via letter, restricting reentry and access to client files, etc.—and there is nothing extreme or

outrageous about such conduct, especially given Arizona's well-settled rule that "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Mintz*, 905 P.2d at 563.  Indeed, in *Mintz,* the employer forced the plaintiff to return to work, which caused her to be hospitalized due to work-related stress, then "delivered a letter to [the plaintiff] in the hospital informing her that her job duties were being reassigned." *Id.* at 552.  Although the Arizona Court of Appeals could "certainly see the apparent callousness and insensitivity of delivering a job-reassignment letter to an employee in [the plaintiff's] condition," it held that "hand deliver[ing] a letter to [the plaintiff] in the hospital cannot be regarded as 'atrocious and utterly intolerable in a civilized community,' even in light of [the plaintiff's] known susceptibility to emotional problems." *Id.* at 563-64.  The Court cannot see how the outcome could possibly be different here. *See also Matson v. Safeway*, *Inc.*, 2013 WL 6628257, *5 (D. Ariz. 2013) ("Termination decisions and circumstances surrounding an employer's method of discharging an employee, whether wrongful or not, generally do not rise to a level of conduct extreme enough to establish an intentional infliction of emotional distress claim.").

   Plaintiff's attempts to distinguish *Mintz* are unavailing.  Although Plaintiff makes much of *Mintz*'s observation that certain conduct by the defendants in that case made the IIED analysis a "closer call," the post-knowledge conduct at issue here is not more outrageous than in *Mintz*.  Unlike the employer in *Mintz*, Defendants did not pressure or force Plaintiff to work after they became aware of her condition.  Rather, they "communicated [they were] supportive of Plaintiff seeking help, encouraged Plaintiff to go to the appointment, and assured Plaintiff [they were] willing to assist as needed." (Doc. 10 ¶ 61.)  Also, Defendants had legitimate business reasons for their decision to prohibit Plaintiff's return to work after deciding to terminate her—namely, to "safeguard confidential client information." (Doc. 11 at 9.) *Compare Mintz*, 905 P.2d at 563 ("The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to

cause emotional distress.") (citation omitted).

B. **Severe Emotional Distress**

To state a claim for IIED, a plaintiff also must allege "severe emotional distress." *Citizen Publ'g Co.*, 115 P.3d at 110 (citation omitted). Whether emotional distress qualifies as "severe" is analyzed on a case-by-case basis. *Lucchesi*, 716 P.2d at 1016. "[T]he distress inflicted [must be] so severe that no reasonable man could be expected to endure it." Restatement (Second) of Torts § 46 cmt. j. "Examples of emotional distress considered severe by the courts" include "heart attack and nervous exhaustion," "premature birth of dead baby," "severe nervousness and headaches resulting in such a breakdown of [the plaintiff's] physical and emotional well being that she was unable thereafter to perform her job," "severe headaches and stress and [the plaintiff's] state of anxiety ultimately requir[ing] hospitalization," and "stress and a relapse resulting in a permanent impairment of [the plaintiff's multiple sclerosis] condition." *Midas Muffler Shop v. Ellison*, 650 P.2d 496, 501 (Ariz. Ct. App. 1982) (citations omitted).

In *Midas*, the Arizona Court of Appeals rejected an IIED claim where the plaintiff "testified that [the challenged conduct] upset her and made her cry, and that she had difficulty sleeping after" the conduct. *Id.* The court emphasized that "[i]t is only where [emotional distress] is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people." *Id.* (citation omitted).

Defendants argue that Plaintiff's allegations "mirror the same normal level of distress which [has] been rejected by Arizona courts as insufficiently severe." (Doc. 11 at 11.) Defendants also argue that Plaintiff's "worry" about her clients' interests is not severe because such worry is "a common and widespread part of her chosen profession." (*Id.*)[5]

---

[5] Defendants ask the Court to "take judicial notice that the practice of law is stressful, and attorneys worry about the needs of their clients." (Doc. 11 at 11.) Plaintiff, in her response, does not deny that lawyers face some degree of stress, although she does dispute the degree and argues that her experience exceeded the normal amount. (Doc 13. at 10.) The Court finds it unnecessary to take formal judicial notice here, both because the parties do not appear to disagree that the practice of law can be stressful and because the Court can "draw on its judicial experience and common sense" to reach the same conclusion. *Iqbal*, 556 U.S. at 679.

1  Last, Defendants argue that "[i]t is also clear from the allegations that Plaintiff's postpartum depression, anxiety, and insomnia all pre-existed the end of her employment and are the result of her pregnancy and becoming a new parent, not Defendants' alleged actions.  To that end, the FAC does not allege that Defendants caused these conditions, only that they 'exacerbated' the same." (*Id.* at 12.)

Plaintiff responds by arguing that the emotional distress alleged in the FAC should be deemed severe. (Doc. 13 at 9-10.) Plaintiff emphasizes that she "became suicidal while working for Defendants after being subjected to months of ridicule and embarrassment, and then after being terminated, suffered from the mental and physical conditions alleged." (*Id.* at 10.)  Plaintiff also argues that her emotional distress "was of a much greater dimension than the day-to-day mental stress any employee, including lawyers, might experience from a job." (*Id.*)

Defendants reply that Plaintiff cannot "cite a single analogous case where the harm she alleges was sufficient to survive a motion to dismiss." (Doc. 14 at 2.)  "Instead, her sole citation is to *Pankratz*, a case with no comparable facts." (*Id.*)  Defendants also argue that "as noted in the Motion, and unrebutted in the Response, Plaintiff does not allege that her distress continues to this day, nor that she sought any further medical treatment following the end of her employment." (*Id.* at 4.)  Defendants argue that despite asserting in her response that she was suicidal, the FAC "does not allege she was or remained suicidal, or that these ideations returned following the end of her employment, or even that Defendants caused the same.  Nor is it a reasonable inference to presume she was suicidal when she does not allege that directly.  And that would contradict her allegations she was in a state of mind to be discharged from the hospital after one day, felt fit to return to the office days later, and denies she was incapable of practicing law." (*Id.*)

Although a close call, the Court agrees with Defendants that the FAC fails to allege the sort of "severe emotional distress" necessary to sustain an IIED claim under Arizona law.  Much of the alleged emotional distress that was directly caused, rather than merely "exacerbated," by Defendants' conduct—Plaintiff's worry about her clients and financial

hardship, nausea, headaches, humiliation, anxiety, excessive crying, loss of self-worth, self-doubt, exhaustion, edginess, and intense anger—is the sort of distress that courts have consistently deemed insufficient in this context. *Midas*, 650 P.2d at 501 (crying, sleeplessness); *Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1108-09 (D. Ariz. 2022) (finding a "single instance of vomiting" did not rise to the level of severe emotional distress as required by Arizona law); *Larsgard v. Mendoza*, 2012 WL 3704680, *5 (D. Ariz. 2012) ("The element of severe emotional distress is noticeably lacking in this case. Plaintiff alleges in the amended complaint that she suffered humiliation and fear. In her response, she claims that she has been under 'huge emotional stress' and has 'practically been without sleep or rest' for the last nine months. These symptoms do not constitute severe emotional distress."); *Spratt v. N. Auto. Corp.*, 958 F. Supp. 456, 461 (D. Ariz. 1996) (allegations of "crying, being stressed and upset, and having headaches" were insufficient to avoid summary judgment).

The alleged distress that comes closest to qualifying as "severe" is Plaintiff's depression and anxiety.[6] On the one hand, courts have sometimes found that such allegations are enough (at least when coupled with other forms of emotional distress) to sustain an IIED claim. *Pankratz*, 744 P.2d at 1186, 1191-92 ("anger and depression and physical ailments including headaches and hemorrhoids" constituted "severe distress"); *Nees v. City of Phoenix*, 2022 WL 17976322, *5 (D. Ariz. 2022) ("At the Motion to Dismiss stage, Plaintiff's allegations of PTSD, anxiety, nervousness, and depression are sufficient to state a claim for IIED."). *But see E.E.O.C. v. GLC Restaurants, Inc.*, 2006 WL 3052224, *9-10 (D. Ariz. 2006) (concluding that "Plaintiffs' emotional effects approach the line of demarcation between emotional distress and severe emotional distress, but they do not cross it" where one plaintiff asserted that the challenged conduct "caused her to suffer from depression" that required medical care). On the other hand, Plaintiff does not allege that Defendants *caused* her depression or anxiety. To the contrary, Plaintiff alleges that "her doctor diagnosed her as suffering from severe postpartum depression and

---

[6] The Court agrees with Defendants that the FAC lacks any allegation that Plaintiff was suicidal.

insomnia" following the birth of her child (Doc. 10 ¶ 63) and that Defendants' subsequent conduct "exacerbated" these preexisting conditions, causing her to suffer from "increased depression and anxiety" (*id.* ¶ 90.) Such allegations seem to undercut the suggestion that any "severe emotional distress" "occur[ed] *as a result of* [Defendants'] conduct." *Citizen Publ'g Co.*, 115 P.3d at 110 (emphasis added) (citation omitted). In a related vein, although Plaintiff alleges that she requested some time off work for "hospitalization and recovery" for her depression, she did so *before* she was subjected to the termination decision and related conduct upon which she bases much of her claim. (*Id.* ¶¶ 67, 73.) These details help distinguish this case from *Pankratz*, where the plaintiff "took himself off of active flying duty" as a result of the challenged conduct. 744 P.2d at 1186. Additionally, unlike in *Pankratz*, Plaintiff does not allege that her distress persisted for a significant amount of time (or continues to this day) or that she sought medical treatment based on the distress she attributes to the challenged conduct. Plaintiff also concedes that her depression and anxiety did not render her incapable of performing her job. (Doc. 10 ¶ 79 ["Defendants further alleged falsely that . . . Plaintiff . . . was unable to practice law."].) These details further undermine Plaintiff's characterization of her emotional distress as severe.

III. <u>Leave To Amend</u>

Plaintiff requests leave to amend in the event of dismissal. (Doc. 13 at 15.) Defendants oppose this request, arguing that "Plaintiff had the opportunity to amend her complaint once already after being apprised of the deficiencies in her IIED claim, which are the same deficiencies that are the subject of this Motion. Defendant again raised the deficiencies in elements one and three when conferring with counsel following the FAC filing, and Plaintiff indicated no further amendment was required." (Doc. 11 at 13-14.)

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith;

(3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Although the Court is skeptical that Plaintiff will be able to plead new facts to cure the deficiencies identified in this order, it will grant her leave request in light of the highly permissive standard under Rule 15(a) and the fact that this is the first contested motion to dismiss.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 11) is **granted**. Count Nine of the FAC is dismissed.

**IT IS FURTHER ORDERED** that Plaintiff may file a Second Amended Complaint ("SAC") within 14 days of the issuance of this order. Any changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiff shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 31st day of October, 2024.

Dominic W. Lanza
United States District Judge